UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

|  |  |
|---|---|
| Veronica Long, ) | C/A No. |
| ) |  |
| Plaintiff, ) |  |
| ) | **COMPLAINT** |
| ) | JURY TRIAL DEMANDED |
| v. ) |  |
| ) |  |
| Sterilite Corporation, ) |  |
| ) |  |
| Defendant. ) |  |

Plaintiff, complaining of Defendant, herein alleges that:

### Nature of the Action

**1.**  Plaintiff Veronica Long ("Plaintiff") brings this action against Defendant Sterilite Corp. ("Defendant") pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Human Affairs Law of the State of South Carolina for sexual harassment, retaliation and constructive discharge.

### Parties and Jurisdiction

**2.**  Plaintiff is a citizen and resident of the County of Newberry, State of South Carolina, and former employee of Defendant. Defendant is a corporation organized and existing under the laws of Massachusetts, but which does business and operates a facility in Laurens County, South Carolina.

**3.**  Venue and jurisdiction are proper as acts listed herein occurred in the Greenville Division and are based upon federal statutes.

1

4.  Prior to filing this Civil Action, Plaintiff filed two Charges of Discrimination based on sexual harassment, retaliation, and constructive discharge with the Equal Employment Opportunity Commission ("EEOC").

5.  Plaintiff has fully exhausted all of her administrative remedies, and this action is timely filed.

## Factual Allegations

6.  Plaintiff was originally hired by Defendant in 2011 as a floor person and was initially paid $10.00 per hour. Plaintiff was the only female worker on the floor. She was the only Hispanic female in the factory.

7.  At all relevant times, Rob Ayers was the Plant Manager.

8.  At all relevant times, Susan Ayers ("Ayers") was the Human Resources Supervisor.

9.  At all relevant times, Plaintiff's immediate supervisor was Kenneth Pearson ("Pearson").

10. During 2011, Plaintiff was called a "Mexican bitch" by an assistant of Sterilite. Plaintiff reported this person and received no help from management or Human Resources.

11. Beginning in 2013, Plaintiff was harassed by a higher ranked employee, Fernando Buritica ("Buritica"). In an insinuating manner, Buritica would ask Plaintiff if she wanted to go outside with him. These requests made her feel extremely uncomfortable. Plaintiff would refute these advances by telling him, "No, we are both married," in order to let him know these requests were inappropriate.

12. After multiple rejections by Plaintiff, Buritica began to give her more work outside of her normal duties as punishment. She was eventually moved to different shift by management. Soon after, Buritica began to spread vicious and untrue rumors that Plaintiff "hated black people" in an effort to turn their co-workers against her.

13. In December 2013, Plaintiff applied for a promotion at Sterilite. Being qualified and capable, she was promoted to the position of level "C" maintenance mechanic in the maintenance department.

14. In January 2014, Sterilite's Business Manager James Hard ("Hard") grabbed Plaintiff's wrists and purposely bruised her. She immediately went to her human resources supervisor, Susan Ayers ("Ayers"), and showed her the bruises. Ayers failed to write down a statement from Plaintiff or any details regarding the incident. At a later date, Ayers told Plaintiff, "I spoke with him and he said he was sorry."

15. Upon information and belief, no action was taken to appropriately address Plaintiff's complaint.

16. During 2014, Buritica began to harass Plaintiff again. Per Ayers's suggestion, Plaintiff began wearing oversized sweatpants to work in order to avoid the ongoing sexual harassment from Buritica.

17. Every time Plaintiff reported Buritica to management or human resources, he would sabotage her machines then she would be written up.

18. During February 2014, Sterilite conducted a sexual harassment training for all employees. After the meeting, Plaintiff was called to the office. Buritica was also called to the office. He was told to "stop it." Susan Ayers was present during this discussion and

refused to let Plaintiff speak. Ayers expressed to Plaintiff, "I don't want to see you in the front office anymore." Ayers then made Plaintiff sign a paper.

19. Upon information and belief, Buritica purposefully and maliciously scratched Plaintiff's car as retribution for her reporting him to management.

20. During this time, Plaintiff was punished by management for her complaints and was instructed to forego her normal daily duties and go outside to pick-up trash.

21. Plaintiff was falsely accused by management for stealing a bracelet from a co-worker.

22. George Santos, a temporary worker at Sterilite, was fired after he verified that Plaintiff was being sexually harassed.

23. During 2015, though Plaintiff was prescribed a medication that instructed that she stay out of direct sunlight, Defendant made her work outside in the sun anyway.

24. In May 2016, Buritica physically pushed Plaintiff on her chest. Plaintiff immediately reported the assault to Susan Ayers. Plaintiff was told by Sterilite, "don't think about suing the company because we pay our lawyers $500.00 an hour." Both Buritica and Plaintiff were suspended. Plaintiff was suspended for 3 days. She was additionally written up for attendance violations for missing those days and thus, suspended for 3 additional days.

25. Getting no relief from management, Plaintiff filed a Charge of Discrimination with the South Carolina Human Affairs Commission June 22, 2016. From that point, Defendant's retaliation continued.

26. On or about November 17, 2016, Pearson placed his hand inside of Plaintiff's clothes pocket in an unwanted and inappropriate manner. She complained

4

directly to Pearson and verbally reported Pearson's conduct to Pete Evans ("Evans"), the second in command from the plant manager.

27. Upon information and belief, no action was taken to appropriately address Plaintiff's complaint.

28. On or about December 9, 2016, Buritica made a hand gesture to Plaintiff as if he were going to shoot her with a bazooka or similar firearm. Pearson saw Buritica make this threatening gesture and laughed in response. Buritica's gesture was especially bothersome because he made a statement to her the prior year that he kept a gun in his truck while at work. He had also physically pushed her in the past. Buritica's threatening gesture, taken in conjunction with his past conduct, caused Plaintiff to reasonably fear for her safety. Buritica told Plaintiff, "I know how to make my enemies pay."

29. Plaintiff reported Buritica to a manager. Ayers called her to the office and confronted her about the incident.

30. Upon information and belief, no action was taken to appropriately address Plaintiff's complaint.

31. On or about December 8, 2016, Plaintiff was washing her hands in the workshop sink area when she overheard Buritica talking to Pearson. Buritica threatened to scratch a Camaro in the parking lot. Plaintiff was one of the only employees who drove a Camaro.

32. On or about December 13, 2016, Plaintiff was working in the same area with Buritica when she took a break to go to the restroom. Upon returning to her station, she noticed that one of the screws she was working with was missing. Buritica was also missing, and she was informed he had left the premises to go to the store. After the

break, she witnessed Buritica talking to Mike Williams and heard Mike respond that he did not want to hear about Buritica's "games" and what he had done. Upon approaching her vehicle later that day in the Sterilite parking lot, she noticed that a screw had been intentionally placed in its right rear tire. She also saw a scratch in the paint near that wheel. Plaintiff's tire was damaged to the extent that her vehicle was not safely operable and she had to have the tire replaced.

33. Following the filing of Plaintiff's initial charge with SCHAC, she was also treated less favorably than before in that she was routinely assigned harder and less favorable tasks than other similarly situated employees, such as cleaning the parking lot.

34. As of December 16, 2016, Plaintiff could no longer take Defendant's harassment and retaliatory treatment. She submitted her letter of signature, fully acknowledging all of her mistreatments and reasons that she felt that she could no longer safely work there.

### First Cause of Action
(Title VII: Sexual Harassment)

35. Plaintiff incorporates the allegations in paragraphs two (2) through thirty-four (34) as set forth verbatim.

36. On numerous occasion for the period of 2011 until December 2016, Defendant intentionally subjected Plaintiff to ongoing discrimination and sexual harassment, including verbal and physical assaults and threats. Plaintiff suffered severe emotional distress as a result of the harassment.

37. The harassment was reported to multiple members of management and was acknowledge by these same actors of the Defendant on multiple occasions. Despite

being aware of the harassment, Defendant failed to take remedial action and the harassment continued.

38.     Defendants actions were willful, malicious and intentional.

39.     As a direct result and consequences of the sexual harassment, Plaintiff has and will suffer compensatory damages including emotional distress, mental anguish and anxiety.

40.     As a further direct result and consequence Plaintiff is entitled to compensatory damages, attorney's fees and costs.

## Second Cause of Action
(Title VII Retaliation)

41.     Plaintiff incorporates the allegations in paragraphs two (2) through forty (40) as set forth verbatim.

42.     When Plaintiff alerted various members of management of the ongoing harassment she was experiencing at work, they began to retaliate against her. Said retaliation was so severe and pervasive that Plaintiff was fearful for her well-being and safety and eventually had to quit her position.

43.     As a direct result and consequences of the retaliation, Plaintiff has and will suffer compensatory damages including emotional distress, mental anguish and anxiety and economic damages including back pay and front pay.

44.     As a further direct result and consequence Plaintiff is entitled to compensatory damages, fringe benefits, back pay, front pay, and attorney's fees and costs.

### **Third Cause of Action**
(Title VII: Constructive Discharge)

45. Plaintiff incorporates the allegations in paragraphs two (2) through forty-four (44) as set forth verbatim.

46. By failing to remediate the harassment and by continually retaliating against Plaintiff, Defendant intentionally created working conditions so intolerable that Plaintiff had no alternative but to resign.

47. As a direct result and consequences of the retaliation, Plaintiff has and will suffer compensatory damages including emotional distress, mental anguish and anxiety and economic damages including back pay and front pay.

48. As a further direct result and consequence Plaintiff is entitled to compensatory damages, fringe benefits, back pay, front pay, and attorney's fees and costs.

**WHEREFORE**, Plaintiff prays for judgment against Defendants for back pay, front pay, fringe benefits, compensatory damages, punitive damages, and attorney's fees and costs.

BURNETTE SHUTT & MCDANIEL, PA

BY:  s/Janet E. Rhodes
Janet E. Rhodes (10521)
PO Box 1929
Columbia, South Carolina 29202
Telephone: (803) 904-7915
Facsimile: (803) 904-7910
Email: jrhodes@burnetteshutt.law
Attorney for Plaintiff

October 27, 2017
Columbia, South Carolina